**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| RAYMOND MYKOLAITIS, et al., | : | CIVIL ACTION NO. 13-1868 (MLC) |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
| v. | : | |
| THE HOME DEPOT U.S.A., INC., et al., | : | |
| Defendants. | : | |

**COOPER, District Judge**

The plaintiffs, Raymond Mykolaitis and Marija Mykolaitis (collectively "plaintiffs;" however, this memorandum opinion will often refer only to Raymond Mykolaitis as "plaintiff"), brought this action against defendants, Husky, The Home Depot, U.S.A., Inc., and Tricam Industries in New Jersey Superior Court, Monmouth County, on February 8, 2013. (See dkt. 1 at 4.) Within thirty days of being served with plaintiffs' summons and complaint, Tricam Industries and The Home Depot, U.S.A., Inc. filed a notice of removal to this Court claiming subject-matter jurisdiction pursuant to 28 U.S.C. § 1332. (See id.; see also id. at 8–13.) This Court terminated the action insofar as it had been brought against Husky on May 7, 2013. (See dkt. 8.)

The remaining defendants – The Home Depot, U.S.A., Inc.; and Tricam Industries (collectively "defendants") – filed this motion to preclude the testimony of plaintiffs' proffered expert, Gene Litwin, on October 9, 2014. (See dkt. 18.) Plaintiffs opposed the motion. (See dkt. 22.) The Court held oral argument on defendants' motion on June 18, 2015. See L.Civ.R. 78.1(b). The Court, for the reasons stated herein, will grant the motion.

I.     BACKGROUND

On February 18, 2011, Raymond Mykolaitis, a 200-pound, 5'10" man, purportedly fell from a Model ASLI 1-6-2, 6-foot, Type I aluminum, 250-pound duty-rated Husky brand stepladder, manufactured in July 2007 and purchased by plaintiff at The Home Depot. (See dkt. 1 at 9; dkt. 18 at 5–6, 9.) As a result of his fall, plaintiff tore his left rotator cuff, requiring surgery, and injured his left ankle. (See dkt. 18-4, Ex. 13, R. Mykolaitis Dep. at 122.)

Plaintiff claims that on the date in question, he set up the stepladder near his house to clean out his gutters. (See id. at 117–18.) After ensuring that the stepladder was stable and there was no wiggle, plaintiff climbed to the third step of the stepladder above the ground and looked at and reached for the gutter above him with his left hand while holding a bag of leaf debris in his right hand. (See id. at 118–20.) At that point, the stepladder "collapsed causing him to fall and sustain serious personal injuries." (Dkt. 1 at 9.) There were no witnesses to the fall; plaintiff states that his son found him after the accident with the stepladder "on top" of him. (See dkt. 18-4, Ex. 13 at 120–22.)

Plaintiffs' allegations include claims that "[s]aid ladder was dangerously defective, unfit and unsafe for its intended purposes and reasonably foreseeable users . . . . due to manufacturing and/or design defects and/or inadequate warnings." (Dkt. 1 at 9.) Additionally, plaintiffs claim that "defendants were negligent with regard to the design, manufacture, testing, formulation, sale and/or distribution of the ladder." (Id.) Plaintiffs further claim breach of warranty, and Marija Mykolaitis alleges loss of consortium from her husband's injuries. (Id. at 9–11.) Despite the allegations regarding a design defect, a manufacturing defect, and a failure to warn, plaintiffs seem to focus only on the claim for a design defect. (See dkt. 18 at 7 (stating that plaintiffs' expert

2

"does not claim that the accident ladder contains (a) a manufacturing, (b) assembly or (c) warning defect . . . .").)

Plaintiffs, because of the design defect claim, hired an expert, Gene Litwin, to testify about the nature of the accident and the design sufficiency of the stepladder. Defendants also hired an expert, Jon Ver Halen, to testify on the same subject. Based on the expert reports issued by plaintiffs' expert, defendants filed this motion seeking to preclude his testimony.

## II. LEGAL STANDARDS

Federal Rule of Evidence ("Rule") 702 governs the admissibility of expert testimony. Rule 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed.R.Evid. 702. Pursuant to Rule 702, the trial judge has a "gatekeeping role" to ensure that all expert testimony or evidence is both relevant and reliable before admission. Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). The Court's gatekeeping function under Rule 702 is "a flexible one," and the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 594–95.

Rule 702 "embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit." Schneider ex rel. Estate of Schneider v. Fried, 320 F.3d 396, 404 (3d Cir. 2003); see In re

3

Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–43 (3d Cir. 1994) (citing Daubert, 509 U.S. at 587–93). "Qualification refers to the requirement that the witness possess specialized expertise." Schneider, 320 F.3d at 404. For reliability, the testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his . . . [or] . . . her belief." Id. (internal citations omitted). In terms of fit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Id.

A court should consider several factors in evaluating whether a particular methodology is reliable. These factors may include:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

In re Paoli, 35 F.3d at 742 n.8 (listing factors deemed important by courts in Daubert and United States v. Downing, 753 F.2d 1224 (3d Cir. 1985)). In addition:

> The factors drawn from Daubert and Downing, however, "are neither exhaustive nor applicable in every case." Kannankeril [v.Terminix Int'l, Inc.], 128 F.3d [802,] 806–07 [(3d Cir. 1997)]; see also Kumho Tire [Co., Ltd. v. Carmichael], 526 U.S. [137,] 151 [(1999)] . . . (noting that Daubert itself "made clear that its list of factors was meant to be helpful, not definitive") . . . . "The inquiry envisioned by Rule 702 is . . . a flexible one." Daubert, 509 U.S. at 594[.]

Pineda v. Ford Motor Co., 520 F.3d 237, 248 (3d Cir. 2008).

The proponent of the expert testimony has the burden of satisfying the Court that Rule 702 requirements are met. See In re TMI Litig., 193 F.3d 613, 705 (3d Cir. 1999) ("[I]t is the burden of the party offering the expert scientific testimony to demonstrate reliability by a preponderance of the evidence."); United States v. Schiff, 538 F.Supp.2d 818, 834 (D.N.J. 2008) ("The burden for demonstrating admissibility lies with the proponent of the expert testimony, by a preponderance of the evidence."), aff'd, 602 F.3d 152 (3d Cir. 2010). The Court examines the proponent's evidence and has broad latitude in determining whether to admit the expert testimony in question. See Kumho, 526 U.S. at 152.

## III. ARGUMENTS

The parties filed briefs for this motion, along with numerous exhibits, and conducted oral argument in front of this Court. The Court will briefly summarize the arguments contained in the briefs and the arguments advanced at oral argument to preserve the entirety of each side's position, before turning to the Court's analysis and disposition of this motion.

### A. Defendants' Argument

Defendants presented nine arguments for why Gene Litwin should be excluded from testifying for plaintiffs under Rule 702. Those arguments, corralled into five major categories, will be reviewed in turn.

#### 1. Litwin is unqualified as a stepladder designer

Defendants argue that Litwin's background does not render him qualified to opine on the matter of stepladder design, the central issue in this case. (See dkt. 18 at 15–17.) Defendants point out that Litwin, while admittedly a mechanical engineer, has no experience with the design of stepladders, and does not have any research to support his claim that the design of the

5

stepladder in question is defective.  (Id. at 15.)  Defendants argue that Litwin's only basis for his opinion that the stepladder in question is defective is an article that does not address key factors specific to this case.  (Id.)  In defendants' opinion, Litwin fails to allege that the stepladder model involved in the accident did not meet industry standards for performance, or cite to any relevant performance tests for stepladders.  (Id.)

Defendants further point to a case about garage door openers, where Litwin was not permitted to offer expert testimony in the case because he had no experience in the design or manufacturing of garage door openers.  (Id. at 16.)  The court in that case also pointed out that Litwin made a living testifying as an expert witness.  Defendants use this case as proof of Litwin's lacking qualifications.

### 2. Litwin's testimony is not reliable

Litwin produced three reports for this matter.  (See dkt. 18-4 at 35–61.)  Defendants state that in his first report, Litwin agreed that the stepladder involved in the accident met industry test protocols at the time of manufacture, and that plaintiff had used the stepladder for three years prior to his fall without incident.  (See dkt. 18-4, Ex. 6A at 43.)  Examining plaintiff's recitation of the facts in his deposition and two outside articles, Litwin concluded that:

> The [stepladder model in question] is defective and unreasonably dangerous in that it lacks adequate strength to prevent the failure of the ladder siderail at its juncture with the lowest step.  This form of stepladder failure has been quite common and well known in the industry for many years.  It was just such a failure which caused the ladder to tip sideways, thereby causing serious injury to Mr. Mykolaitis.

(Id.)  Defendants argue that in forming this opinion, however, Litwin "performed no tests, calculations or computer modeling to support the opinions that (1) the [stepladder model in question] was defective or (2) side rail weakness caused Mykolaitis' fall."  (See dkt. 18 at 18.)

6

Litwin then issued a second report that introduced a new theory that plaintiff had "racked" the stepladder while using it on the date in question. (See dkt. 18-4, Ex. 6B at 49.) "Racking" involves moving the stepladder's rear feet laterally, offsetting the rear feet to either the right or left side. (See id.) In the case of plaintiff's accident, Litwin believes the rear feet were offset to the left. (See id. at 52–53.) Thus, Litwin argued that as plaintiff climbed the stepladder, "weight shifted to the left side of the stepladder [which caused] the left siderail [to] fail[] suddenly by buckling inwards at the [bottom] first step and [causing] the ladder [to fall] . . . over." (Id. at 53.) Defendants claim that again Litwin came to his conclusion without any testing, modeling, or calculations. (See dkt. 18 at 18–19.)

Litwin issued a third and final report in March 2014, rebutting the findings of defendants' experts. (See dkt. 18-4, Ex. 6C at 54–61.) Defendants claim that in this report, Litwin abandons his previous theories and presents a third potential factual scenario. (See dkt. 18 at 20.) Defendants claim this third theory contradicts plaintiff's own deposition testimony. (Id.)

### 3. Litwin's methodology for his theory is unreliable

Defendants argue that plaintiffs have not met their burden under Rule 702 to satisfy the Court that Litwin used an acceptable engineering methodology to draw any of the conclusions in his reports. (Id. at 22–23.) For example, one of Litwin's theories involves racking; however, Litwin does not claim that the stepladder model in question did not meet the industry standard test for racking. (Id. at 23.) Litwin further does not suggest that the industry test for racking is insufficient or deficient. (Id.) Instead, Litwin suggests that the stepladder may not meet another industry test on bending – a test that the stepladder in question did in fact pass. (Id. at 23 n.17.)

7

Defendants contend that Litwin further failed to explain key elements of his theories or effectively rebut counter evidence. (See id. at 23–24.) Defendants argue this evidences Litwin's ignorance or avoidance of facts. (Id. at 23 n.17.)

### 4. Litwin ignores plaintiffs' testimony

"In order for an expert's theory of defect and causation to be admissible pursuant to Rule 702, the theory must 'fit' the case facts." (Dkt. 18 at 23 (citing Fitzpatrick v. Louisville Ladder, No. 99-29, 2001 WL 1568389 (D. Neb. Dec. 6, 2001)).) Defendants claim that when "Litwin is confronted by Mykolaitis' testimony negating both Litwin's 'racking' and 'walking' claims, Litwin attempts in Exhibit 6C [the third report] to 'explain away' Mykolaitis' testimony", and tries to "suggest[] that Mykolaitis **simply did not notice** that he had 'racked' the stepladder before he climbed it." (See dkt. 18 at 23.) Mykolaitis testified, however, that at all times on the date in question, all four feet of the stepladder were placed firmly on level ground in a rectangular configuration. (See id. at 26; dkt. 18-4, Ex. 13 at 118–19.) Defendants also claim that Litwin, in the face of plaintiff's admissions, continued to use articles in forming his opinions – namely the Masory & Rink article, "Stepladder Instability and Dynamic Loading" – that contradicted plaintiff's testimony. (See dkt. 18 at 26–28.)

### 5. Litwin failed to present an alternative stepladder design

Defendants argue that Litwin failed to present an alternative stepladder design that would have been safer and cured the defects of the stepladder in question. (See id. at 28.) Instead, based upon an article in the magazine Consumer Reports, "Litwin suggests a Costco ladder is 'better' than the [stepladder in question]. Litwin does not provide test results supporting this claim or test

8

results showings that the Costco ladder cannot be 'racked.'" (Id. at 28 n.20.)  Defendants claim that this failure also renders Litwin's testimony inadmissible.  (Id. at 29–30.)

### B. Plaintiffs' Argument

Plaintiffs begin their opposition to defendants' motion by pointing out that defendants never deposed Litwin.  (See dkt. 22 at 13.)  Plaintiffs then go on to argue that defendants confuse the elements of qualifications and reliability.  (Id. at 15.)  Plaintiffs claim that the United States Court of Appeals for the Third Circuit has "liberally" interpreted the requirement that an expert witness have special expertise, holding that "a broad range of knowledge, skills, and training qualify an expert as such."  In re Paoli, 35 F.3d at 741.  (See dkt. 22 at 15.)

Plaintiffs, in advocating for Litwin's qualifications, explain that Litwin is a mechanical engineer by training, holding a degree in the field, and is a member of the Mechanical Engineering Honor Society and the American Society of Mechanical Engineers.  (See dkt. 22 at 16.)  Further, Litwin has been employed in positions such as Research & Development Engineer and Senior Engineer Consultant for a safety research and training company.  (See id.)  Plaintiffs state that according to Litwin's curriculum vitae ("CV"), Litwin "has sat on ANSI [American National Standards Institute] Code Committees and tested stepladders pursuant to ANSI standards," as well has having been qualified as a court expert on three occasions.  (Id.)

On the subject of reliability, plaintiffs distinguish the garage door opener case cited by defendants that claims that Litwin was not permitted to testify, by arguing that the preclusion was due to an issue of spoliation and not a Daubert deficiency by Litwin.  (Id. at 16–17.)  The rest of plaintiffs' argument seems to center on explaining why Litwin did not perform further testing in forming his opinions.  Plaintiffs claim that it would not have been helpful to recreate the fall

9

scenario as "there are so many unknown variables" and the stepladder model in question is no longer in production so an identical exemplar is unavailable. (Id. at 20.) Plaintiffs believe it is sufficient that Litwin inspected the stepladder involved in plaintiff's fall, and formulated his theory through analysis of deposition testimony and his experience with stepladder "design/safety/accidents." (Id. at 21.)

Plaintiffs state that Litwin's theory did not evolve or change, but remained the same throughout his three reports:

> The Husky ASL 1-6-2 was defective and unreasonably dangerous in that it lacked adequate strength to prevent the failure of the ladder siderail at its juncture with the lowest step—according to the facts and the inspection of the ladder, it failed and buckled inwards as plaintiff's weight shifted to the left of the ladder, causing it to collapse and fall over.

(Id. at 21–22.) Thus, plaintiffs state than any problems that the defendants have with Litwin's testimony can be explored and examined on cross-examination, but do not merit defendants' requested relief. (Id. at 23–24.)

### C.      Defendants' Response

Defendants argue that plaintiffs continue to fail to establish Litwin's qualifications by a preponderance of the evidence. While plaintiffs stated that Litwin's experience with stepladders is listed on his CV, defendants claim that his CV makes no such reference, nor does Litwin's third report, which would typically state such experience. (See dkt. 25 at 6.)

Defendants then address the garage door opener case, which plaintiffs attempted to distinguish. (Id. at 7–9.) Defendants cite exact passages from the court's opinion in that case, explaining its rationale for excluding Litwin's testimony under Rule 702 for the proponent's failure to satisfy the Daubert standards. (Id. at 8.)

10

Defendants continue by arguing that they were not required to depose Litwin and that no exemplar stepladder was requested by plaintiffs or Litwin, nor was any stepladder ever tested by Litwin. (Id. at 11–12.) Additionally, defendants state that plaintiffs never established why it was acceptable for Litwin to have failed to perform any testing or modeling. (Id. at 9–11.) Thus, defendants argue that plaintiffs "have not established by a preponderance of the evidence that Litwin's testimony is admissible" because plaintiffs' response fails to present admissible evidence demonstrating: "that the accident ladder was defectively designed," "that the alleged defective design caused Mykolaitis' fall," and that "of a feasible alternative design." (Id. at 14.)[1]

## D.    Oral Argument

Defendants, at oral argument on this motion, examined Litwin's various theories put forth over the course of his three reports. Defendants began by explaining the damage pattern seen in the plaintiff's accident: the bottom step of the stepladder bent upward toward the top of the stepladder and the siderails at the bottom of the stepladder underneath the bottom step bent in

---

[1]    Much is made of the fact that defendants do not believe that Litwin proposed a feasible alternative design, which defendants argue Litwin must do because of Litwin's claim that all Type I aluminum, 250-pound duty-rated stepladders are defective and prone to causing the type of accident that occurred with plaintiff. (See dkt. 18 at 28–30.) Plaintiffs point to Litwin's reports, which suggest alternatives such as "heavier siderails", "a heavier first/bottom step", and "adding an additional step", as providing sufficient alternative designs. (See dkt. 18-4, Ex. 6A at 41–42.)
         "Under New Jersey law, to succeed under a strict-liability design-defect theory, a plaintiff must generally prove that (1) the product was defective; (2) the defect existed when the product left the hands of the defendant; and (3) the defect caused the injury to a reasonably foreseeable user." Mays v. Gen. Binding Corp., 565 Fed.Appx. 94, 96 (3d Cir. 2014) (citing Jurado v. W. Gear Works, 619 A.2d 1312, 1317 (N.J. 1993) (citations omitted)). "In a design defect case, a plaintiff who asserts that the product could have been designed more safely must prove under a risk-utility analysis the existence of an alternative design that is both practical and feasible." Mays, 565 Fed.Appx. at 96 (citing Lewis v. Am. Cyanamid Co., 715 A.2d 967, 980 (N.J. 1998) (citations omitted)). While Litwin's alternative design ideas seem to lack assessments of practicality, feasibility, and scientific proof, the true insufficiency lies with Litwin's underlying theory of the accident, which in turn taints his alternative ideas. (See infra §§ IV.B, C.)

toward one another. (See dkt. 18-4, Ex. 1 at 2.) Defendants then explained the only two methods for reproducing such a damage pattern. First, if the stepladder fell while an individual was standing on it, and then the individual fell on top of the stepladder, the same damage pattern would occur. Second, if the stepladder fell while an individual was standing on it, but the individual held onto the stepladder as it fell to the ground, and the top cap of the stepladder struck on an object on the way down, the damage pattern could be replicated.[2] These scenarios, defendants explained, are important in determining whether Litwin's theories – explained over the course of three reports – could actually account for the damage pattern seen on the stepladder involved in plaintiff's accident.

Defendants, using this framework, then discussed the plausibility of each of Litwin's theories, relying on assistance from demonstrations with a Type I aluminum, 250-pound duty-rated stepladder – the same type of stepladder involved in plaintiff's accident.

The exemplar stepladder used by defense counsel at oral argument was not a Husky-brand stepladder because that model was discontinued by the manufacturer and apparently no samples are available. Therefore, the exemplar stepladder used at oral argument was a different brand but the same design, model, and ANSI specifications as plaintiffs' stepladder. It is worth noting that the Husky stepladder involved in plaintiff's accident met ANSI requirements for stepladder safety. Litwin believes that this fact does not matter because "those requirements are inadequate." (See dkt. 18-4, Ex. 6C at 60.) Litwin provides no support for this assertion.

---

[2] The parties did agree at oral argument that there was no such object in plaintiff's vicinity that the stepladder could have struck on the way down.

Litwin's first theory posited that the bottom step of the stepladder and the siderails on either side of the bottom step were too weak.  Because of this weakness, the siderails bent in and the bottom step bent upward as the result of plaintiff's weight on the stepladder.  Defendants argued that such a downward force, even if exerted on a weak step, would not cause the damage pattern seen in plaintiff's accident.  Further, Litwin never reproduced the damage pattern on any exemplar stepladder to support this theory.

Litwin's second report seemed to suggest that racking occurred, unbeknownst to plaintiff, which caused the fall.  (See dkt. 18-4, Ex. 6B at 44–53.)  Racking requires one leg of the stepladder to be off of the surface.  (See id. at 49.)  Defendants criticized this report, as it directly contradicts plaintiff's deposition testimony, where plaintiff states that all four feet stayed on the ground and that he "definitely" would have noticed if the stepladder was unstable.  (Dkt. 18-4, Ex. 13 at 116, 118–19.)  Further, Litwin seemed to realize that his weakness-causing-buckling theory, put forth in his initial report, would not cause the damage pattern seen on the stepladder.  (See dkt. 18-4, Ex. 6B at 52–53.)

Litwin's third report, as a result of defendants' critiques, suggested that the mere fact that plaintiff does not remember that the stepladder was racked or may not have realized it at the time, does not mean that the stepladder was not racked.  (See dkt. 18-4, Ex. 6C at 55–56.)  Additionally, he then stated that once the racked stepladder caused plaintiff to fall because the siderail buckled, the stepladder fell and plaintiff landed on the left side of it.  (See id. at 60.)  Litwin also introduced the concept that plaintiff may have walked the stepladder, which is when an individual tries to

13

move the stepladder along the ground while still on the stepladder. (See id. at 59–60.)[3] Finally, Litwin made his last hypothesis regarding the cause of the accident, claiming "[i]t is more likely that the siderail buckled first" due to structural weakness, but if that was not the cause, then "the ladder is nonetheless defective in its lacking of appropriate strength and resistance to walking" which caused plaintiff's accident. (See id. at 61.)

Plaintiffs, at oral argument, distilled Litwin's theories down to one, stating that Litwin believed that plaintiff unintentionally racked the back right leg of the stepladder before climbing up on it. With the stepladder racked and plaintiff standing on the stepladder, a disproportionate amount of weight was placed on its front left leg. (See id.) The stepladder was not strong enough to support this extra weight, causing the left siderail to buckle inward, pushing the first step upward, and pulling the opposite right siderail in as well, accounting for the damage pattern in plaintiff's accident. (See id.)

It is this theory that defendants attacked and demonstrated to be a physical impossibility. At the time of plaintiff's accident, he stated that he had his right foot on the second step and was stepping up to the third step with his left foot. (See dkt. 18-4, Ex. 13 at 119.) Defendants stated that simple laws of physics dictate that as an individual climbs a stepladder, the weight of that individual is shifted to the back of the stepladder. As a result, the left front leg, which plaintiffs

---

[3] Walking a stepladder is not considered an intended or a normal use of a stepladder. Because of this, if plaintiff had walked the stepladder, which then caused his fall, it would foreclose the viability of his products liability claim. See Metzgar v. Playskool Inc., 30 F.3d 459, 462 (3d Cir. 1994) (stating that a product is not defective unless it possesses a feature that would make it unsafe for its intended use). Plaintiff, however, stated that on his last climb of the stepladder before he fell, he did not move it after he secured it in place, and that all four feet of the stepladder remained on the ground prior to his fall. (See dkt. 18-4, Ex. 13 at 119, 120.)

14

claim was the one that buckled due to racking, would never buckle as the extra weight would be shifted to the back legs of the stepladder. Instead, if the right back leg of the stepladder was racked as Litwin claimed and plaintiff started to climb up the stepladder, plaintiff would fall off the stepladder due to the sudden shift in the weight transferring onto the back right racked leg, startling plaintiff and causing him to lose his balance. Defendants confirmed this scenario in a demonstration during oral argument.

Defendants further confirmed and identically replicated the damage pattern found in plaintiff's accident by performing lab testing on an exemplar Type I aluminum, 250-pound duty-rated stepladder. (See dkt. 18-4, Ex. 12 (Video).) In the video, the stepladder is laid on one side and then a weight is dropped onto the opposite siderail sticking up in the air; at the location of the juncture of that siderail and the bottom step. When that weight lands on the stepladder, both siderail legs below the first step bend inward and the first step bends upward – perfectly recreating the damage pattern seen on the stepladder in plaintiff's accident. (See id.) Thus, defendants' theory was that plaintiff lost his balance on the stepladder, the stepladder fell, and plaintiff landed on top of it. (See dkt. 18-4, Ex. 8 at 69.) Litwin failed to produce any reproduction or testing of his own, or refute defendants' video reproduction.

Plaintiffs ended their argument by stating that the presence of two theories in the case – that of defendants' expert, Jon Ver Halen, and that of plaintiffs' expert, Gene Litwin – shows that it is appropriate to allow in the testimony of both experts, subject both to cross-examination, and let the jurors decide who they believe to have articulated the accurate theory of the accident.

## IV. ANALYSIS

The Court will review this motion through the trilogy of restrictions on expert testimony: "qualification, reliability and fit." Schneider, 320 F.3d at 404; see In re Paoli, 35 F.3d at 741–43 (citing Daubert, 509 U.S. at 587–93).

### A. Qualification

"Qualification refers to the requirement that the witness possess specialized expertise." Schneider, 320 F.3d at 404. The Court is satisfied that Litwin's qualifications are sufficient for the purposes of testifying in this litigation. While Litwin seems to lack an appreciable amount of relevant experience with stepladders, plaintiffs' counsel assures the Court that – despite the absence of any relevant experience on his CV – Litwin has had stepladder experience and that his qualifications as a mechanical engineer suffice for the purposes of determining design defects in stepladders. The Court takes some issue with the fact that Litwin repeatedly claimed there was no way to perform tests on a stepladder because no identical stepladder was available. (See dkt. 18-4, Exs. 6A–6C at 35–61.) Litwin held a position as Research & Development Engineer and Senior Engineer Consultant for a safety research and training company. (See dkt. 22 at 16.) The Court is inclined to believe that with such a background, Litwin would have seen the value in testing a different exemplar Type I aluminum, 250-pound duty-rated stepladder in order to help demonstrate his theories and reproduce the damage pattern from the accident. That issue notwithstanding, the Court ultimately does not find Litwin's qualifications insufficient.

### B. Reliability

To establish reliability, the testimony "must be based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good

16

grounds for his . . . [or] . . . her belief." Schneider, 320 F.3d at 404 (quoting In re Paoli, 35 F.3d at 742 (quoting Daubert, 509 U.S. at 590) (internal citations omitted)). The major shortcoming in Litwin's testimony centers on reliability – the changing nature of Litwin's theories indicates to the Court that Litwin has said nothing to a reasonable degree of scientific certainty. See In re Zoloft Prods. Liab. Litig., 26 F.Supp.3d 466, 474 (E.D. Pa. 2014) (citing Daubert, 509 U.S. at 590); see also Blizzard v. Motorola Inc., No. 94-207, 1996 WL 37840, at *3 (E.D. Pa. Jan. 30, 1996).

Litwin, over the course of his three reports, changes his theories and introduces new concepts when confronted by Ver Halen's testimony that Litwin's theory does not account for the damage pattern seen in plaintiff's accident. (See dkt. 18-4, Exs. 6A–6C at 35–61.) In the end, Litwin centers on an explanation of likely-this-but-could-be-that. (See dkt. 18-4, Ex. 6C at 61.) The problem with this conclusion is that in developing it, he failed to perform any tests, conduct any reenactments, or examine any models, leaving his conclusion to be, at best, an educated guess. For expert testimony on an alleged design defect of a product, a guess is not enough. See In re Zoloft, 26 F.Supp.3d at 474. Litwin rejects the industry-accepted ANSI requirements, waving them away with nothing other than a characterization as "inadequate" and fails to provide any other reliable method for coming to his conclusion. (See dkt. 18-4, Ex. 6C at 61.) In fact, he fails to provide any method for the Court to assess for reliability aside from a scholarly article. As a result, the Court holds that Litwin fails to meet the reliability threshold set out in Daubert.

### C.     Fit

In terms of fit, "the expert's testimony must be relevant for the purposes of the case and must assist the trier of fact." Schneider, 320 F.3d at 404. The Court need not discuss fit after holding Litwin's testimony precluded under Rule 702 due to a lack of reliability. It is instructive,

however, to discuss this element as it further reinforces the Court's conclusion.  As demonstrated by defendants in the video exhibit of their expert testing and at oral argument, Litwin's theories do not fit the damage pattern seen in plaintiff's accident.  In fact, based on these sources, Litwin's theory seems impossible, as the damage pattern is only replicated by a force falling on the siderail of the stepladder once the stepladder has fallen to the ground.  (See dkt. 18-4, Ex. 12 (Video); see also supra n.2.)  Further, Litwin's final theory relies on the stepladder being racked – an aspect which plaintiff himself strongly refutes in his testimony.  (See generally dkt. 18-4, Ex. 13 at 119–20.)[4]  For these reasons, Litwin's testimony is further precluded as it does not "fit" with the nature of the accident.

## V.    CONCLUSION

For the reasons stated, and for good cause shown, the Court will grant defendants' motion to preclude the testimony of plaintiffs' proffered expert.  The Court will issue an appropriate order.

          s/ Mary L. Cooper
**MARY L. COOPER**
United States District Judge

Dated: July 6, 2015

---

[4] The fact that plaintiff's son reportedly observed the stepladder "on top" of plaintiff when the son arrived at the scene would be relevant to a trier of fact.  (See dkt. 18-4, Ex. 13 at 121.)  However, that does not create a genuine issue as to defect, given the other facts described in the evidence and that any tumbling interaction between plaintiff and the stepladder was not witnessed by his son.  (See id.)

18